**GREAT WEST CASUALTY COMPANY, Plaintiff-Appellant,**

v.

**MALLINGER TRUCK LINE, INC., Reliance Insurance Companies, Processed Beef Express, CNA Insurance Company; and Joyce Steinmetz, Defendants-Respondents.**

**No. WD 32708.**

Missouri Court of Appeals, Western District.

Aug. 10, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 5, 1982.

Application to Transfer Denied Nov. 15, 1982.

---

**480**

William H. Sanders, Jack F. Olson, James Bandy, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for plaintiff-appellant.

Arthur C. Popham, Jr., Popham, Conway, Sweeny, Freemont & Bundschu, P.C., Kansas City, for defendants-respondents Reliance Ins. Companies and Processed Beef Exp.

H. George Lafferty, Jr., Kansas City, for defendant-respondent Steinmetz.

Kenneth O. Smith, Knipmeyer, McCann, Fish & Smith, Kansas City, for CNA Ins. Co.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This is an appeal from a declaratory judgment suit determining which of two insurance companies is primarily responsible for policy coverage in a wrongful death claim arising out of an automobile accident. The basis of this determination rests on the relative responsibilities of the companies' insureds under a lease agreement containing an indemnity provision between the lessor-owner of the vehicle involved and the Interstate Commerce Commission (I.C.C.) permit holding lessee-carrier. From stipulated facts, the trial court entered judgment finding appellant, Great West Casualty Company (Great West), the primary insurer and Reliance Insurance Companies (Reliance), the secondary insurer. Great West appeals.

Iowa Beef Processors, Inc. (IBP) owned frozen beef quarters it needed to ship by truck from Emporia, Kansas to St. Paul, Minnesota. Its wholly-owned subsidiary, Processed Beef Express (PBX) (insured by Reliance) was an interstate motor carrier with the necessary I.C.C. authority to haul

cargo on the desired route. PBX entered into a written agreement with Mallinger Truck Lines, Inc. (Mallinger) (insured by Great West) whereby PBX (lessee) leased a tractor, trailer and driver from Mallinger (lessor) to transport IBP's cargo to St. Paul. Under the terms of the "trip lease", PBX assumed control of the lease equipment.[1] The driver was to remain the employee of Mallinger, although under PBX's control. In addition, the lease contained the following indemnity provision:

> Lessor (Mallinger) shall indemnify and hold Lessee (PBX) harmless from any and all manner of actions and causes of action, suits, judgments, claims and demands whatsoever arising out of this Lease Agreement or connected herewith. Lessor shall procure liability and property damage insurance with a total combined single limit of $1,000,000, and all-risk cargo insurance with a liability limit of $100,000 per unit. Lessor shall, by continuing endorsement, include Lessee on all such insurance policies as an also-named insured and shall furnish to Lessee within a reasonable time from the execution of this Lease such coverage. In the event of cancellation or material change of such policies or cancellation of said endorsement, Lessor shall furnish Lessee 10 days advance notice thereof. Lessee shall have no responsibility for loss, damage or destruction to the equipment herein covered.

PBX directed the driver, Dennis Day, to haul IBP's beef, suspended on rails from the ceiling of the trailer, to St. Paul. While rounding a curve on an overpass in downtown Kansas City, the trailer tipped over, spilling the beef onto a car below and killing the driver, Martin Steinmetz. Steinmetz's widow filed a wrongful death action in the circuit court of Jackson County seeking five million dollars in damages, alleging the negligence of IBP, PBX, Mallinger, Day and the trailer's manufacturer caused her husband's death.

PBX had a $500,000.00 trip liability policy issued by Reliance, and a $10,000,000.00 excess policy. In accordance with I.C.C. and Missouri regulations, PBX, holder of the license and requesting this particular trip permit, filed with the I.C.C. and the Missouri Public Service Commission a certificate of the insurance issued by Reliance. Mallinger had a $1,000,000.00 policy issued by Great West. Although Mallinger, in the lease agreement, promised to add PBX as an additional insured to this policy with Great West, and had done so on many occasions prior to and after the accident, PBX was omitted as a named carrier recipient of Great West's coverage for this particular trip. This omission was apparently due to an oversight.

Prior to reaching the Steinmetz wrongful death action, the trial court ruled on Great West's declaratory judgment action. The court found:

> That the indemnity agreement between Mallinger and PBX is valid, effective, enforceable, not a violation of I.C.C. regulations, and not void as against public policy.

> That Mallinger's policy with Great West should be reformed to include PBX as an additional insured in accordance with the customary "additional insured endorsement" and that PBX is an additional insured under Mallinger's policy with Great West during the period which covers June 20, 1979.

> That Mallinger is not an additional insured under the policy issued to PBX by Reliance.

> That the equipment and driver were Mallinger's, and Mallinger agreed to indemnify PBX from liability. Therefore, Mallinger's policy extending coverage to PBX is primary and the policy written by Reliance on PBX is secondary.

Great West's two contentions of error assert: 1) the indemnity portion of the

---

1. The lease agreement read: "It is further understood and agreed that for the term of this Lease Agreement, the Leased Equipment is under the control of the Lessee (PBX) and it shall be operated only by the Lessor (Mallinger) or its agents while under the direction of Lessee, and Lessor shall follow all instructions given by Lessee."

lease agreement is invalid; and 2) that the I.C.C. endorsement on the Reliance policy makes that coverage primary as a matter of law.

For its first contention, Great West maintains the trial court erred in ruling that the indemnity and "hold harmless" provisions in the PBX trip lease were valid and enforceable. It argues that federal law prohibits I.C.C. permit holding lessees from shifting liability to nonpermit holding lessors. The United States Supreme Court decision in *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975), addressed a similar contention.

In *Brada Miller,* the lessor agreed to indemnify and save harmless the I.C.C. authorized lessee from any and all claims arising out of the lessor's negligence. The lessor later attempted to disavow its liability by challenging the indemnity agreement as being contrary to public policy and unenforceable. It argued that the indemnity clause derogated I.C.C. regulation 49 CFR § 1057.-3(a) (1975), which requires the lessee to assume "control and responsibility of the operation of the equipment." The Supreme Court, however, disagreed, stating that "[t]he separate indemnification clause in the subsequent paragraph 9 of the lease did not affect this basic responsibility of the lessee to the public; it affected only the relationship between the lessee and the lessor." *Id.* at 39, 96 S.Ct. at 234. The Court reasoned that because the regulations do not expressly prohibit an indemnification provision between the lessor and lessee, a provision directing the lessor to bear the burden of its own negligence "does not, in and of itself, offend the regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations." *Id.* at 40, 96 S.Ct. at 235.

The court further states that although the law requires one party to be responsible to the public (which was accomplished in the lease agreement here), that party may indemnify without violating commission rules unless there is evidence the lessor was in control of the service provided as well as physical control of the vehicle. The court held that the furnishing of the truck and driver by lessor only gave the lessor physical control, and that control and responsibility for the actual shipment was with the lessee.

■ Great West acknowledges *Brada Miller* but argues that the indemnity clause in the instant case did not fall within that "narrow" holding, *i.e.* "[W]e hold only that the presence in an equipment lease of an indemnification clause directed to *the lessor's* negligence is not in conflict with the safety concerns of the Commission (I.C.C.) or with the regulations it has promulgated." *Id.* at 41, 96 S.Ct. at 235 (emphasis added). Great West maintains that the lease agreement here goes beyond that holding as it shifts to the lessor liability coverage for *all* negligence, the lessee's as well as the lessor's. Great West argues that such an expanded shift of liability coverage would conflict with I.C.C. policy because of its tendency to diminish the lessee's attention to operational safety and its concomitant responsibility to the public.

A similar argument was addressed in *Allstate Insurance Company v. Alterman Transport Lines, Inc.,* 465 F.2d 710 (5th Cir.1972), decided before but cited approvingly in *Brada Miller.* There, the lessor who provided the vehicle and driver agreed to indemnify the lessee for any damage done to or suffered by the driver or other persons in connection with the operation of the lease unit during the term of the lease. The *Allstate* court stated this indemnification agreement was not in contravention of I.C.C. regulations, particularly 49 CFR § 1057.4(a)(4) (a parallel provision to § 1057.3(a)). The court exposed the specious nature of this argument in saying:

> The only conceivable argument against such an arrangement would be that the regulation seeks to prevent indemnification on the theory that a trucking company, knowing it does not have to pay damages, might tend to be less careful in supervising and controlling the actions of its truck drivers. However, the same can

be said of insurance coverage which the regulations obviously do not prohibit. We are of the opinion that had the I.C.C. intended to prevent indemnification between trucking companies it would have said so in precise terms.

*Id.* at 713. *See also, General Expressways, Inc. v. Schreiber Freight Lines, Inc.,* 377 F.Supp. 1159, 1160–61 (N.D.Ill.1974).

Several federal and state court decisions subsequent to *Brada Miller* have interpreted that decision to embrace an indemnity provision which shifts to the lessor responsibility for *all* liability. In *Mustang Transportation Company v. Ryder Truck Lines, Inc.,* 523 F.Supp. 1097 (E.D.Pa.1981), the lease contained the following provision: "It is agreed that Lessor . . . will carry acceptable Public Liability and Property Damage Insurance. Lessor . . . agrees to reimburse and otherwise indemnify Lessee . . . *for any and all losses* sustained by Lessee . . . resulting from the use of the aforesaid equipment." *Id.* at 1104 (emphasis added). As in the case at bar, the lease, in accordance with the regulations, gave the lessor no control over the manner in which the lessee operated the truck. The lessors argued against enforcement of this indemnity clause, maintaining it was not the type of provision found permissible in *Brada Miller* as it was not directed specifically at the lessor's negligence. The court rejected their argument:

> While I would agree that the indemnity clause here is more broad in scope than the one found enforceable in the *Transamerican* decision, I do not believe that fact compels a conclusion that the clause is invalid and not enforceable as to this transaction involving Crowder's [the lessor] negligence. There is nothing in that decision which suggests that a provision like the instant one would be violative of 49 CFR § 1057.4(a)(4).

*Id.* at 1104. *See also Daily Express, Inc. v. Northern Neck Transfer Corp.,* 490 F.Supp. 1304 (M.D.Pa.1980); *Empire Fire And Marine Insurance Co. v. State Farm Mutual Insurance Co.,* 368 So.2d 1329 (Fla.App. 1979); *Continental Insurance Co. v. Daily Express, Inc.,* 68 Wis.2d 581, 229 N.W.2d 617 (1975).

Also with regard to the validity of the indemnity clause, the lease agreement provided that "[t]he performance and execution of this lease agreement shall be governed by the laws of Nebraska." Great West cites to *Denver Midwest Motor Freight, Inc. v. Busboom Truck, Inc.,* 190 Neb. 231, 207 N.W.2d 368 (1973), for a statement of Nebraska law. In *Busboom,* the court held that an indemnity agreement similar to that in the instant case violated I.C.C. regulations. Although the Nebraska courts have not overruled this decision, *Busboom* relied primarily on *Alford v. Major,* 470 F.2d 132 (7th Cir. 1972), a decision the U.S. Supreme Court rejected in *Brada Miller.* Furthermore, in *Brada Miller,* the Supreme Court noted the *Busboom* case as a decision "seemingly consistent" with the lower court's decision it reversed. *Brada Miller, supra,* 423 U.S. at 34 n. 6, 96 S.Ct. at 232 n. 6. The *Brada Miller* case and its progeny control to deny Great West its first point. The indemnification agreement here is a risk allocation mechanism freely entered into by both parties that does not diminish the lessee-carrier's legal liability and financial responsibility to the public—it only covers the relationship between the lessor and lessee. Public policy is not contravened by such an agreement as the regulatory agencies may still look to the permit holder lessee for responsibility.

■ In its second point, Great West challenges the trial court's holding that its policy (as reformed by the trial court making PBX an additional insured) provided primary coverage. Great West asserts the required I.C.C. endorsement attached to the Reliance policy issued to PBX makes that coverage primary as a matter of law. The Interstate Commerce Commission's Form B.M.C. 90, entitled "Endorsement for Motor Carrier Policies of Insurance for Automobile Bodily Injury and Property Damage Liability Under Section 215 of the Interstate Commerce Act," provides, in substance, that no policy provision or stipulation is to insulate the insurer from paying a

judgment rendered against the I.C.C. certified carrier (PBX).[2] The applicable regulations in a lease agreement to a certified carrier require the lessee to assume exclusive control over the equipment and assume all responsibility for it to the public and any regulatory agency, 49 CFR § 1057.3(a); 49 CFR § 1057.4(a)(4).

In *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304 (5th Cir.1978), the court considered in a declaratory judgment action between two insurance companies facts similar to those here. There, the lessor, who supplied the driver, agreed to: (1) hold harmless the lessee, the I.C.C. carrier, for its driver's claims against the lessee, (2) provide property damage and public liability insurance and (3) furnish a certificate of insurance showing the lessee as a named insured. An accident occurred due to the driver's negligence and the lessor's insurer sought to avoid liability by claiming that the lessee insurer's I.C.C. endorsement made its coverage primary as a matter of law. The court rejected this theory, holding that the purpose of the I.C.C. regulation requiring the endorsement was to assure the public and shippers that the certified carrier have independent financial responsibility, and that this purpose was served even if there were "other insurers who clamor for part or all of the coverage." *Id.* at 312. As the court stated:

> I.C.C. policy factors are frequently determinative where protection of a member of the public or a shipper is at stake, but those factors cannot be invoked by another insurance company which has contracted to insure a specific risk and which needs no equivalent protection. *Id.* at 313.

Thus, the court held the I.C.C. required endorsement did not make the lessee's insurer the primary insurer as a matter of law, even where the lessor also carried insurance, and the lease agreement had a hold harmless provision from lessor to lessee.

Although the facts here vary from the *Underwriters* case in some respects, the reasoning is controlling. No public policy reason exists to rule that the I.C.C. endorsement automatically makes a policy afford primary coverage when the only question is which company should recompense the injured party as per the two companies' independent agreement. As the *Underwriters* opinion stated, such is not the purpose of the I.C.C. endorsement. *See also Carolina Casualty Ins. Co. v. Insurance Company of North America,* 595 F.2d 128, 138 (3rd Cir. 1979); *Transport Indemnity Co. v. Paxton Nat'l. Ins. Co.,* 657 F.2d 657, 659 (5th Cir. 1981); *Truck Ins. Exchange v. Transport Indemnity Co.,* 591 P.2d 188, 194 (Mont. 1979).

Great West cites several cases which hold that an I.C.C. endorsement attached to an insurance policy renders that policy's coverage primary as a matter of law, but the facts of those cases are distinguishable. In *Argonaut Ins. Co. v. National Indemnity Co.,* 435 F.2d 718 (10th Cir.1971), the I.C.C. certified carrier's insurer sought to avoid all but excess coverage based on an "other

---

2. Form B.M.C. 90 states: [T]he Company hereby agrees to pay, within the limits of liability hereinafter provided, any final judgment recovered against the insured for bodily injury to or death of any person, or loss of or damage to property of others ... *resulting from negligence in the operation, maintenance, or use of motor vehicles under certificate of public convenience and necessity or permit issued to the insured by the Interstate Commerce Commission ....*

Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement therein or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability hereunder or from the payment of any such final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

insurance" clause in its policy, even though the I.C.C. endorsement was attached to that same policy which states that no condition, provision, stipulation or limitation in the policy could relieve the insurer from liability under that endorsed policy. (*See* footnote 2). The court held the endorsement prohibited exactly what the insurer was requesting the court do.

In *Hagans v. Glens Falls Ins. Co.,* 465 F.2d 1249 (10th Cir.1972), the I.C.C. certified lessee-carrier's insurer sought to avoid primary coverage based on the lessee's independent lease agreement with the lessor which provided the lessor agreed to carry liability and property damage insurance for the vehicles with the lessee as an additional insured. The court extended the theory of *Argonaut* by holding that the lessee's insurer could not avoid liability as primary insurer by relying on *either* the terms of the lessee's policy (*i.e. Argonaut*) *or* the terms of a collateral agreement between the named insureds. *Id.* at 1252. As in the instant case, the lease agreement contained an indemnification clause. Although the court ignored the indemnity agreement in its decision, that clause bound the *lessee* to indemnify, not the *lessor* as does the indemnity agreement here. Thus, the I.C.C. endorsement and the parties' agreement did not conflict, as *both* made the lessee primarily responsible. The court's decision that the I.C.C. endorsement override the collateral agreements of the parties worked no injustice but, rather, was in line with the parties' expressed intentions. This is not the case here. The reasoning in *Underwriters,* contrary to *Argonaut* and *Hagans,* that the I.C.C. endorsement does not as a matter of law and for all purposes make that policy primary, is the most persuasive and controlling. *See also Truck Ins. Exchange v. Transport Indemnity, supra.*

There is no reason here to prohibit a court from looking to collateral agreements of the parties as to how the coverage should be allocated as long as the policy considerations of the I.C.C. regulations are not diluted or abrogated. Those considerations are not affected here, and the parties' arms-length agreement should not be ignored.

Mallinger and PBX agreed to the indemnity provisions as well as making PBX a named insured on the Great West policy; this was part of their bargain and should not be now ignored by Mallinger's insurance company where there is no diminution of recovery resulting to an insured third party. Section 215 of the Interstate Commerce Act states its purpose is to provide security for the protection of the public. "The clearly expressed intent of the form B.M.C. 90 endorsement is to provided that under no circumstances will the insurer be relieved of liability to 'any person' injured or damaged as a result of its insured's negligence. The 'public' is thereby afforded the legislatively mandated 'protection'." *Transport Indemnity Co. v. Rollins Leasing Corp.,* 14 Wash. App. 360, 541 P.2d 1226, 1229 (1975). PBX did not shirk its responsibility to the public. It produced the insurance with the endorsement required by the I.C.C. and the Missouri Public Service Commission. It was required to do no more. Great West's second point is denied.

There being no factual dispute, and the trial court not erroneously declaring or applying the law, the judgment of the trial court is affirmed. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).